**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **PATRICIA ARCHER**, on behalf of herself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>**CITIZENS AND FARMERS BANK**,<br><br>  Defendant. | Case No. 3:24-cv-267<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Patricia Archer ("Plaintiff"), brings this Class Action Complaint against Defendant Citizens and Farmers Bank ("Defendant") and alleges as follows:

## INTRODUCTION

1.     This case concerns Defendant's unlawful business practice of assessing (a) $36 overdraft fees ("Overdraft Fees" or "OD Fees") on debit card transactions authorized on sufficient funds, (b) $36 OD and insufficient funds fees ("NSF fees") on days when the account balance is positive, and (c) multiple $36 fees on an item.

2.     These practices breach promises made in Defendant's "Terms and Conditions of Your Account," attached as Ex. A hereto, "Notice of Changes of Terms and Conditions" attached as Ex. B hereto, Defendant's "Personal Service Pricing Updates," attached as Ex. C hereto (the "Fee Schedule"), "Notice Regarding Posting Order of Items and Holds Due to Pending

Transactions," attached as Ex. D hereto, and, upon information and belief, Defendant's Overdraft Opt-In Form[1] attached as Ex. E hereto (together with Exs. A-E, the "Contract").

3.      Plaintiff and other customers of Defendant have been injured by Defendant's improper fee maximization practices. Plaintiff, individually and on behalf of the classes of individuals preliminarily defined below, brings claims for Defendant's breach of contract, including the duty of good faith and fair dealing, and unjust enrichment.

## PARTIES

4.      Plaintiff Patricia Archer is a citizen of Virginia and a resident of Amelia Court House, Amelia County, Virginia, which is in this District.

5.      Defendant Citizens and Farmers Bank is a bank with its principal place of business located in West Point, King William County, Virginia, which is in this District. It has over $2.4 billion in assets and maintains branches throughout Virginia.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) because the subject matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class is a citizen of a State different from Defendant. The number of members of the proposed Class in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

7.      This Court has personal jurisdiction over Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

---

[1]      Federal regulators require banks and credit unions to use an overdraft opt-in form substantially similar to the model Form A-9 overdraft opt-in for ATM and one-time debit card transactions attached hereto as Ex. D. 12 C.F.R. § 1005.17(b)(1).

8.      Venus is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## BACKGROUND FACTS

9.      In 2021, the largest financial institutions in America charged customers almost $11 billion in OD Fees. Customers who carried an average balance of less than $350 paid 84 percent of these fees. *Why Poverty Persists in America* (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

10.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD Fees or Insufficient Funds Fees ("NSF Fees") entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

11.     Federal regulators have also taken action. For example, the Consumer Financial Protection Bureau (CFPB) recently fined Regions Bank $191 million, finding that it "acted unfairly and abusively" in violation of the Consumer Financial Protection Act of 2010 by assessing the same "surprise" APSN fees at issue here. CFPB, Enforcement Actions, Regions Bank (Sep. 28, 2022), available at https://www.consumerfinance.gov/enforcement/actions/regions-bank_2022.

12.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of significant profit, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS.

13.    Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

14.    Defendant's practice is as follows: the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

15.    However, Defendant still assesses crippling $36 OD Fees on many of these transactions and misrepresents its practices in the Contract.

16.    Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

17.    Defendant maintains a running account balance, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

18.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

19.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

20.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

21.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

22.    The CFPB again criticized the assessment of OD Fees on APSN Transactions in its

October 2022 circular, stating:

Even if a consumer closely monitors their account balances and carefully calibrates their spending in accordance with the balances shown, they can easily incur an overdraft fee they could not reasonably anticipate because financial institutions use processes that are unintelligible for many consumers and that consumers cannot control . . .

For example, even when the available balance on a consumer's account—that is, the balance that, at the time the consumer initiates the transaction, would be displayed as available to the consumer—is sufficient to cover a debit card transaction at the time the consumer initiates it, the balance on the account may not be sufficient to cover it at the time the debit settles. The account balance that is not reduced by any holds from pending transactions is often referred to as the ledger balance. The available balance is generally the ledger balance plus any deposits that have not yet cleared but are made available, less any pending (i.e., authorized but not yet settled) debits. Since consumers can easily access their available balance via mobile application, online, at an ATM, or by phone, they reasonably may not expect to incur an overdraft fee on a debit card transaction when their balance showed there were sufficient available funds in the account to pay the transaction at the time they initiated it. Such transactions, which industry commonly calls "authorize positive, settle negative" or APSN transactions, thus can give rise to unanticipated overdraft fees.

6

. . .

> Charging an unanticipated overdraft fee may generally be an unfair act or practice. Overdraft fees inflict a substantial injury on consumers. Such fees can be as high as $36; thus consumers suffer a clear monetary injury when they are charged an unexpected overdraft fee. Depending on the circumstances of the fee, such as when intervening transactions settle against the account or how the financial institution orders the transactions at the end of the banking day, consumers could be assessed more than one such fee, further exacerbating the injury. These overdraft fees are particularly harmful for consumers, as consumers likely cannot reasonably anticipate them and thus plan for them.

*Consumer Financial Protection Circular 2022-06: Unanticipated Overdraft Fee Assessment Practices*, Consumer Financial Protection Bureau 5-6 (Oct. 26, 2022), https://bit.ly/3SNPg69.

23.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of significant profit each year.

24.     But Defendant was not content with this profit from OD Fees on intervening transactions alone. Instead, it sought even more in OD Fees on APSN Transactions.

25.     Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**A.    Mechanics of a Debit Card Transaction**

26.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to

Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

27.     At this step, if the transaction is approved, Defendant immediately decrements the funds in an accountholder's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

28.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

29.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

30.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**B.     Defendant's Contract**

31.     Plaintiff has a checking account with Defendant, which is governed by the Contract. Exs. A-E.

32.     The Contract states, "Generally, an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway." Ex.

A at 2; Ex. B at 1. Additionally, the Contract states, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Ex. E.

33.     The Contract also states that "[y]ou understand that we may, at our discretion, honor withdrawal requests that overdraw your account." Ex. A. In breach of these promises, Defendant assesses $36 OD Fees when there is enough money in the account to pay, cover or honor the withdrawal request.

34.     Defendant also expressly promises that (1) it will place holds on funds at the time of the authorization of a debit card transaction, which is when Defendant is required to decide whether to honor the transaction, and (2) that these holds reduce Plaintiff's available balance, which is the balance Defendant uses to assess OD Fee:

> We use the "available balance" method to determine whether your account is overdrawn, that is, whether there is enough money in your account to pay for a transaction…. As the name implies, your available balance is calculated based on the money "available" in your account to make payments. In other words, the available balance takes transactions that have been authorized, but not yet settled, and subtracts them from the actual balance.

Ex. A at 3; Ex. B at 1

35.     Additionally, the Contract states that "the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold." Ex. A at 4; Ex. B at 2. Consequently, the Contract warns that fees may be assessed on intervening transactions solely because the funds placed subject to the "debit authorization hold" have been "deducted" from the account are no longer "available" for use: "If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, you will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in account." Ex. A at 4; Ex. B at 2.

36. The Contract is clear that it is the placement of these holds, not the subsequent settlement of the transaction, that "may cause your account to become overdrawn": "Please be aware that holds will be placed on your account for pending electronic transactions such as . . . purchases using your debit card. These holds reduce your available balance and may cause your account to become overdrawn." Ex. D at 1.

37. The Contract also warns accountholders that overdraft fees may "result" if the consumer "creat[es] an item without sufficient funds": "We encourage you to make careful records and practice good account management. This will help you to avoid creating items without sufficient funds and potentially incurring the resulting fees." Ex. B at 2; Ex. A at 4.

38. The Contract again warns that overdrafts are determined at authorization, as it repeatedly links overdrafts to the time Defendant exercises its discretion to either pay or decline the transaction.

39. For example, the Contract states that "Item(s) presented without sufficient funds in your account may be paid (causing an overdraft) or returned at our discretion." Ex. D at 1. The Contract repeats this promise, stating Defendant may "at [its] discretion, honor withdrawal requests that overdraw your account." Ex. A at 3; Ex. B at 1. Defendant again promises that overdrafts occur when Defendant decides to pay or return the transaction, explaining, "[i]f we do not authorize and pay an overdraft, your transaction will be declined." Ex. E.

40. This language is vital because, as the Contract acknowledges, previously authorized debit card transactions "generally cannot be returned." Ex. D at 1.

41. Upon information and belief, Defendant further promises that debit card transactions are paid at authorization and that overdrafts will be determined at the time Defendant "authorize[s] and pay[s]" the debit card transaction:

We do *authorize and pay* for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We do not *authorize and pay* overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always *authorize and pay* any type of transaction.

If we do not *authorize and pay* an overdraft, your transaction will be declined….

What if I want [Institution Name] to *authorize and pay* overdrafts on my ATM and everyday debit card transactions?

If you also want us to *authorize and pay* overdrafts on ATM and everyday debit card transactions, call …

. . .

__ I do not want [Institution Name] to *authorize and pay* overdrafts on my ATM and everyday debit card transactions.

__ I want [Institution Name] to *authorize and pay* overdrafts on my ATM and everyday debit card transactions.

Ex. E (bolded italics added).

42.     Upon information and belief, Defendant links the terms payment to authorization *8 times*, meaning that transactions are paid, and therefore overdrafts are determined, at authorization of a debit card transaction.

43.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover or authorize and pay those transactions—yet Defendant assesses OD Fees on them anyway.

44.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

45.     All of the above representations and contractual promises made by Defendant are untrue. Defendant charges fees eve3n when sufficient funds exist to cover transactions that are authorized into a positive balance. The parties did not agree that Defendant may impose fees on any APSN Transactions. Instead, the parties agreed that overdrafts would be determined at authorization, meaning Defendant may *not* assess OD Fees on APSN Transactions.

46.     The Contract also misconstrues Defendant's true debit card processing and overdraft practices.

47.     First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

48.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the Contract causes consumers like Plaintiff to incur more OD Fees than they should.

49.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

50.     Because these withdrawals take place upon initiation, the funds could not be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

51.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

52.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then

charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

53.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

54.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

55.     In sum, there is a difference between Defendant's practices as described in the Contract and Defendant's actual practices.

56.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant never did here.

57.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

58.     Defendant and its accountholders make no such agreement, and actually agreed to the opposite. The Contract thus misleads and deceives accountholders.

**C.     Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

59.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent

transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

60.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

61.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards as the money comes directly out of the checking account.

62.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://bit.ly/3v5YL62.

63.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

64.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

65.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

66.     In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



*Id.*

67.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

68.     Ultimately, unclear and misleading fee representations like those in Defendant's Contract mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid . . . end up being hit by fees nonetheless." *Id.*

15

69.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

70.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

71.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

72.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

**D.      Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

73.     On April 5, 2022 and November 9, 2022, Plaintiff was assessed a $36 OD Fee on a debit card transaction, even though the transaction had been previously authorized on sufficient funds.

74.     Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover the transactions and should not have been assessed these fees.

75.     The improper fees charged by Defendant were also not errors, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

76.     Plaintiff therefore had no duty to report the fees as errors because they were not errors, but the fees were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

77.     Moreover, any such reporting would have been futile because Defendant had made a decision to charge the fees in this specific manner to maximize its profits at the expense of customers.

## II.     DEFENDANT ASSESSES OD AND NSF FEES WHEN THERE ARE SUFFICIENT FUNDS IN THE ACCOUNT TO COVER THE TRANSACTION.

78.     The Contract states that "[y]ou agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance *as accrued*." Ex. A at 1 (emphasis added).

79.     The Contract states that fees will be assessed at the time a transaction is "presented" for payment: "You agree that we may charge you an NSF fee each time an item or transaction is presented if the amount of money." Ex. A at 3; Ex. B at 1 (same, emphasis omitted).

80.     In breach of this promise, Defendant does not deduct charges, such as NSF and OD Fees, as these fees accrued or when a transaction is presented.

81.     Instead, Defendant assesses the fee one or more days after the item that purportedly overdrew the account is presented. This often results, as here, in the assessment of a fee on a day when the accountholder has already brought the account positive and should not be subject to a fee.

### A.  Plaintiff was charged OD Fees when her accrued balance was positive.

82.     On May 18, 2022, an item from Homeshield/HSA in the amount of $82.99 purportedly overdrew Plaintiff's account.

83.     Because the fee accrued when the item was presented to the account on May 18, 2022, Defendant was contractually obligated to assess the fee on May 18, 2022.

17

84.     Defendant did not do so. Instead, Defendant charged Plaintiff a $36 OD Fee on May 19, 2022, even though, prior to the assessment of the fee, Plaintiff had brought the account balance positive by more than $800.

85.     On October 19, 2022, an item from DirectTV in the amount of $275.81 purportedly overdrew Plaintiff's account.

86.     Because the fee accrued when the item was presented to the account on October 19, 2022, 2022, Defendant was contractually obligated to assess the fee on October 19, 2022.

87.     Defendant did not do so. Instead, Defendant charged Plaintiff a $36 OD Fee on October 20, 2022, even though, prior to the assessment of the fee, Plaintiff had brought the account balance positive by more than $400.

88.     On December 21, 2022, an item from Synchrony Bank in the amount of $33.00 purportedly overdrew Plaintiff's account.

89.     Because the fee accrued when the item was presented to the account on December 21, 2022, Defendant was contractually obligated to assess the fee on December 21, 2022.

90.     Defendant did not do so. Instead, Defendant charged Plaintiff a $36 OD Fee on December 22, 2022, even though, prior to the assessment of the fee, Plaintiff had brought the account balance positive by more than $200.

91.     On January 18, 2023, an item from Homeshield/HSA in the amount of $103.99 purportedly overdrew Plaintiff's account.

92.     Because the fee accrued when the item was presented to the account on January 18, 2023, Defendant was contractually obligated to assess the fee on January 18, 2023.

93.     Defendant did not do so. Instead, Defendant charged Plaintiff a $36 OD Fee on January 19, 2023, even though, prior to the assessment of the fee, Plaintiff had brought the account balance positive by more than $190.

94.     On February 22, 2023, an item from Sheffield Fin Web in the amount of $256.20 purportedly overdrew Plaintiff's account.

95.     Because the fee accrued when the item was presented to the account on February 22, 2023, 2023, Defendant was contractually obligated to assess the fee on February 22, 2023.

96.     Defendant did not do so. Instead, Defendant charged Plaintiff a $36 OD Fee on February 23, 2023, even though, prior to the assessment of the fee, Plaintiff had brought the account balance positive by more than $600.

97.     The improper fees charged by Defendant were not errors by Defendant, but rather intentional charges made by Defendant as part of its standard processing of transactions.

98.     Plaintiff therefore had no duty to report the fees as errors.

99.     Moreover, any such reporting would have been futile as Defendant's own contract admits that Defendant made a decision to charge the fee.

## III.    PLAINTIFF NEVER AGREED TO BE ASSESSED MULTIPLE FEES ON AN ITEM.

100.     Defendant unlawfully maximizes its already profitable fees through its deceptive and contractually-prohibited practice of charging multiple non-sufficient funds fees "NSF fees," or an NSF fee followed by an Overdraft Fee, "OD fees," on an item.

101.     Unbeknownst to consumers, when Defendant reprocesses an electronic payment item, ACH item, or check for payment after it was initially rejected for insufficient funds, Defendant chooses to treat it as a new and unique item that was subject to yet another fee.

102.     The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-I 1-700b, FDIC-I 1-704k, 2012 WL 7186313.

103.     The FDIC also recently recommended that the multiple fee practice be halted entirely. *See* Barbarino, Al. "FDIC Warns Banks About Risks of Bounced Check Fees." Law360,

Aug. 19, 2022, available at https://www.law360.com/articles/1522501/fdic-warns-banks-about-risks-tied-to-bounced-check-fees.

104.    And, in its latest issue of Consumer Compliance Supervisory Highlights, the FDIC again addressed the charging of multiple non-sufficient funds fees for transactions presented multiple times against insufficient funds in the customer's account. *See* FDIC Consumer Compliance Supervisory Highlights, Mar. 2022, available at https://www.fdic.gov/news/financial-institution-letters/2022/fil22014.html. FDIC examiners have scrutinized this issue in recent exams, with some exams remaining open pending resolution of the issue.

105.    In the Supervisory Highlights, the FDIC discussed potential consumer harm from this practice in terms of both deception and unfairness under the Federal Trade Commission Act Section 5's prohibition on unfair or deceptive acts or practices. The FDIC stated that the "failure to disclose material information to customers about re-presentment practices and fees" may be deceptive. *Id*. at 8.

106.    During 2021, the FDIC identified consumer harm when financial institutions charged multiple NSF fees for the re-presentment of unpaid transactions. Terms were not clearly defined, and disclosure forms did not explain that the same transaction might result in multiple NSF fees if re-presented. While case-specific facts would determine whether a practice is in violation of a law or regulation, the failure to disclose material information to customers about re-presentment practices and fees may be deceptive. This practice may also be unfair if there is the likelihood of substantial injury for customers, if the injury is not reasonably avoidable, and if there is no countervailing benefit to customers or competition. For example, there is risk of unfairness if multiple fees are assessed for the same transaction in a short period of time without sufficient notice or opportunity for consumers to bring their account to a positive balance. *Id*.

20

107.    In its staff analysis of the issue, the American Bankers Association ("ABA") recommended that banks review their deposit account agreement to ensure it states clearly that a separate NSF fee will be assessed whenever the same item is resubmitted against insufficient funds. ABA also encouraged banks, if scrutinized by a regulator, to explain the significant logistical challenges with identifying items that have been resubmitted by the merchant for payment against insufficient funds. ABA is updating its staff analysis of this issue to reflect the Supervisory Highlights. *See* ABA Banking Journal, *FDIC provides guidance on multiple NSF fees for re-presented items*, April 1, 2022, available at https://bankingjournal.aba.com/2022/04/fdic-provides-guidance-on-multiple-nsf-fees-for-re-presented-items/.

108.    Further, this abusive multiple fee practice is not universal in the financial services industry. Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed. Instead, Chase charges one fee even if an item is reprocessed for payment multiple times.

109.    Defendant, however, engages in this abusive and deceptive practice in violation of its own contract and against the reasonable expectations of its customers.

110.    The Contract allows Defendant to take certain steps when paying a check, electronic payment item, or ACH item when the accountholder does not have sufficient funds to cover it. Specifically, Defendant could (a) pay the item and charge a $36 fee; or (b) reject the item and charge a $36 fee.

111.    In contrast to the Contract, however, Defendant regularly assesses two or more fees on item.

**A.      The Imposition of Multiple Fees on an Item Violates Defendant's Express Promises and Representations**

112.    The Contract provides the general terms of Plaintiff's relationship with Defendant,

and therein Defendant makes explicit promises and representations regarding how an item will be processed, and how fees may be assessed.

113.    The Contract states that "an overdrawn account will typically result in you being charged an overdraft fee or an NSF fee" (singular). Ex. A at 2; Ex. B at 1.

114.    The Fee Schedule states:

Overdraft fee/Returned item fee, per item
    Sixth and greater occurrence                          36.00
    *You will not be charged more than **$360.00** per day.*

Ex. C.

115.    The Contract defines an "item" to "include[] checks you issue, drafts you've authorized, electronic transfers, transactions that clear through the Automated Clearing House system (ACH), debit card purchases, ATM withdrawals and various other preauthorized withdrawals." Ex. D at 1.

116.    Read together, the Contract thus means that consumers may be charged "$36.00" "per" "check or draft that the consumer issued or authorized.

117.    The Contract also states that:

> If an item drafted by you (such as a check) or a transaction you set up (such as a preauthorized transfer) is presented for payment in an amount that is more than the amount of money available in your account, and we decide not to pay the item or transaction, you agree that we can charge you an NSF fee for returning the payment. ***Be aware that such an item or payment may be presented multiple times and that we do not monitor or control the number of times a transaction is presented for payment. You agree that we may charge you an NSF fee each time a payment is presented if the amount of money available in your account is not sufficient to cover the payment, regardless of the number of times the payment is presented.***

118.    Taken together, these promises mean that Defendant may assess "a fee" (singular) of $36 "per item" "each time a payment is presented" by the accountholder (referred to as "you"

above).

119.    In breach of these promises, Defendant assesses multiple $36 fees per item on a payment that the accountholder only presented once.

120.    This means that customers can be assessed up to $108 in fees per item.

121.    The same "item" on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

122.    Even if Defendant reprocessed an instruction for payment, it is still the same "item." Its reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

123.    Defendant and its customers never agreed that Defendant could assess multiple fees for a single check, electronic payment item, or ACH item that was returned for insufficient funds and later reprocessed one or more times and returned again.

124.    In sum, Defendant promised that one fee would be assessed "per item," and this term must mean all iterations of the same instruction for payment. As such, Defendant breached its Contract when it charged more than one fee per item.

125.    Reasonable consumers understand any given authorization for payment to be one, singular "item," as that term is used in the Contract.

126.    Taken together, the representations identified above convey to customers that all submissions for payment of the same item will be treated as the same "item," which Defendant will either authorize (resulting in an overdraft item) or return (resulting in a returned item) when it decides there are insufficient funds in the account. Nowhere do Defendant and its customers agree that Defendant will treat each reprocessing of a check, electronic payment item, or ACH

item as a separate item, subject to additional fees.

127.    Customers reasonably understand, based on the language of the Contract, that Defendant's reprocessing of checks, electronic payment items, and ACH items are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger fees. In other words, it is always the same item.

128.    Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it.

129.    For example, Community Bank, NA, discloses its fee practice in its online banking agreement as follows:

> We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. **You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.**

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank N.A. 5 (Nov. 12, 2019), https://bit.ly/3uQafe7 (emphasis added).

130.    Community Bank informs its accountholders that they may be charged multiple OD or NSF fees if a merchant, *someone other than the accountholder*, submits the same item multiple times.

131.    In contrast, the Contract provides no such authorization.

**B.    Plaintiff's Experience**

132.    In support of his claim, Plaintiff offers examples of fees that should not have been assessed against his checking account. As alleged below, Defendant: (a) reprocessed a previously returned electronic transaction; and (b) charged an additional fee upon reprocessing.

133.    On or around January 19, 2022, Plaintiff attempted a payment to Direct TV in the amount of $239.12.

134.    Defendant rejected that payment due to insufficient funds in Plaintiff's account and charged a $36 fee for doing so.

135.    Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around January 24, 2022, Defendant processed the item for a second time, rejected the item again, and charged Plaintiff a second NSF fee, of $36, for doing so.

136.    ***In sum, Defendant charged Plaintiff $72 in fees on an item.***

137.    Plaintiff understood the payment to be a single item as is laid out in the Contract, capable of receiving, at most, a single fee if Defendant returned it, or a single fee if Defendant paid it.

138.    Defendant also understands this because, on information and belief, Defendant's back office transactional data displays a re-presented item as a "RETRY PYMT" – meaning the re-presentment is merely a "retry" of the original item, rather than a new item subject to a new fee.

139.    The improper fees charged by Defendant were not errors, but rather intentional charges made by Defendant as part of its standard processing of items.

140.    Plaintiff therefore had no duty to report the fees as errors.

141.    Moreover, any such reporting would have been futile as Defendant had made a decision to charge the fees in this specific manner to maximize profits at the expense of customers.

## IV.    THESE IMPROPER FEES BREACHED DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING.

142.    Pursuant to Virginia law, a duty of good faith and fair dealing is imposed on every contract.

143.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has

been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Defendant gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Defendant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Defendant has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

144.    Here—in the adhesion agreements Defendant imposed on Plaintiff and its other customers—Defendant provided itself with numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abused that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged these fees.

145.    Defendant exercised its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assessed improper fees. Further, Defendant abused the power it had over customers and their bank accounts and acted contrary to their reasonable expectations under the Contract. This is a breach of Defendant's implied covenant to engage in fair dealing and act in good faith.

146.    It was bad faith and entirely outside Plaintiff' reasonable expectations for Defendant to use its discretion to assess fees in these circumstances.

## CLASS ACTION ALLEGATIONS

147.    Plaintiff brings this action individually and as a class action on behalf of the following proposed classes (the "Classes"):

The APSN Class: All Defendant checking accountholders who, during the applicable statute of limitations, were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

The Positive Balance Class: All Defendant's checking accountholders who, during the applicable statute of limitations, were assessed an overdraft fee on a day when the account had a positive balance.

The Multiple Fee Class: All Defendant's checking accountholders who, during the applicable statute of limitations, were assessed multiple fees on an item.

148.    Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, if necessary, before this Court determines whether certification is appropriate.

150.    The time period for the Classes is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

151.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

152.    The claims of Plaintiff are typical of the claims of the Classes in that Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a

common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other members of the Classes.

153.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Class.

154.    Among the questions of law and fact common to the Classes include:

    a.   Whether Defendant violated its Contract by charging OD Fees on APSN Transactions;

    b.   Whether Defendant violated its Contract by charging multiple fees on a single item;

    c.   Whether Defendant violated its Contract by charging fees on dates when the account was not overdrawn;

    d.   Whether these fee practices breached the Contract and the duty of good faith and fair dealing and/or unjustly enriched Defendant;

    e.   The proper method or methods by which to measure damages; and

    f.   The declaratory relief to which the Classes are entitled.

155.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

156.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

157.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

158.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees.

### FIRST CLAIM FOR RELIEF
**Defendant's Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing on Behalf of Plaintiff and the APSN Class**

159.    Plaintiff incorporates by reference the preceding paragraphs.

160.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's Contract. Exs. A-E.

161.    All of Defendant's account holders, including Plaintiff and the members of the APSN Class, are subject to the Contract.

162.    All contracts entered by Plaintiff and the APSN Class are identical or substantively identical because Defendant's form contracts were used uniformly.

163.    Defendant misconstrued in its Contract its true OD Fee practices and breached the express terms of its Contract.

164.    No Contract provision authorizes Defendant to charge OD Fees on transactions that do not actually overdraw the account.

165.    Defendant breached the terms of its Contract by charging OD Fees on transactions

that do not actually overdraw the account.

166.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

167.    Under Virginia law, good faith is an element of every contract between banks and/or credit unions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

168.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

169.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

170.    Defendant abused the discretion it granted to itself when it charged OD Fees on transactions that do not actually overdraw the account.

171.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

172.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) maximizing fee revenue from Plaintiff and other members of the ASPN Class.

173.    Plaintiff and members of the ASPN Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Defendant's Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing on Behalf of Plaintiff and the Positive Balance Class**

174.    Plaintiff incorporates by reference the preceding paragraphs.

175.    Plaintiff and Defendant have contracted for banking services, as embodied in Defendant's Contract. Exs. A-E.

176.    All of Defendant's account holders, including Plaintiff and the members of the Positive Balance Class, are subject to the Contract.

177.    All contracts entered by Plaintiff and the Positive Balance Class are identical or substantively identical because Defendant's form contracts were used uniformly.

178.    Defendant misconstrued in its Contract its true fee practices and breached the express terms of its Contract.

179.    No Contract provision authorizes Defendant to charge an OD or NSF fees at a time when the Class member's account has a positive balance.

180.    Defendant breached the terms of its Contract by charging OD and/or NSF fees on a positive account balance.

181.    Plaintiff and members of the Positive Balance Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

182.    Under Virginia law, good faith is an element of every contract between banks and/or credit unions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

183.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

184.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

185.    Defendant abused the discretion it granted to itself when it charged OD and/or NSF fees on a positive account balance.

186.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

187.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) maximizing fee revenue from Plaintiff and other members of the Positive Balance Class.

188.    Plaintiff and members of the Positive Balance Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
**Defendant's Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing on Behalf of Plaintiff and the Multiple Fee Class**

189.    Plaintiff incorporates by reference the preceding paragraphs.

190.    Plaintiff and Defendant have contracted for banking services, as embodied in

Defendant's Contract. Exs. A-E.

191.    All of Defendant's account holders, including Plaintiff and the members of the Multiple Fee Class, are subject to the Contract.

192.    All contracts entered by Plaintiff and the Multiple Fee Class are identical or substantively identical because Defendant's form contracts were used uniformly.

193.    Defendant misconstrued in its Contract its true fee practices and breached the express terms of its Contract.

194.    No Contract provision authorizes Defendant to charge multiple fees on the same transaction.

195.    Defendant breached the terms of its Contract by charging multiple fees on the same transaction.

196.    Plaintiff and members of the Multiple Fee Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

197.    Under Virginia law, good faith is an element of every contract between banks and/or credit unions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

198.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

199.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

200.    Defendant abused the discretion it granted to itself when it charged multiple fees on an item.

201.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

202.    Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) maximizing fee revenue from Plaintiff and other members of the Multiple Fee Class.

203.    Plaintiff and members of the Multiple Fee Class have sustained damages as a result of Defendant's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment In the Alternative to the First and Second Claims for Relief**
**On Behalf of Plaintiff and the Classes**

204.    Plaintiff incorporates by reference the preceding paragraphs.

205.    This Count is brought solely in the alternative to Plaintiff breach of contract and breach of the covenant of good faith and fair dealing claim.

206.    To the detriment of Plaintiff and the Classes, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

207.    Plaintiff and the Classes conferred a benefit on Defendant when they paid Defendant fees that were not allowed under the Contract.

208.    Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits,

which under the circumstances, would be unjust to allow Defendant to retain.

209.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

210.    Plaintiff and the Classes, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court:

a.  Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

b.  Award Plaintiff and the Classes actual damages in an amount according to proof;

c.  Award Plaintiff and the Classes restitution in an amount to be proven at trial;

d.  Award Plaintiff and the Classes pre-judgment interest in the amount permitted by law;

e.  Award Plaintiff and the Classes attorney's fees and costs as permitted by law;

f.  Declare Defendant's practices outlined herein to be unlawful to the extent they breach the parties' contract;

g.  Grant Plaintiff and the Classes a trial by jury;

h.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

i.  Grant such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff, by counsel, demands trial by jury.

Dated:  April 11, 2024                    Respectfully submitted,


                                        */s/ Devon J. Munro*

Devon J. Munro
**MUNRO BYRD, P.C.**
120 Day Avenue SW, Suite 100
Roanoke, Virginia 24016
Telephone: (540) 283-9343
dmunro@trialsva.com

David M. Berger (*pro hac vice* forthcoming*)*
**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Telephone: (510) 350-9700
Fax: (510) 350-9701
dmb@classlawgroup.com

Shawn K. Judge (*pro hac vice* forthcoming)
Mark H. Troutman (*pro hac vice* forthcoming)
**GIBBS LAW GROUP LLP**
1554 Polaris Parkway, Suite 325
Columbus, Ohio 43240
Telephone: (510) 350-9700
Fax: (510) 350-9701
skj@classlawgroup.com
mht@classlawgroup.com

Lynn A. Toops (*pro hac vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
ltoops@cohenandmalad.com

J. Gerard Stranch, IV (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gstranch@stranchlaw.com

*Attorneys for Plaintiff and the Putative Class*